WK/CJC:DE/MEB/AS
F. #2018R02245

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ DEC 1 8 2019 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

     - against –

DANIEL SARGEANT,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

I N F O R M A T I O N

Cr. No. <u>19-CR-319 (ENV)</u>
(T. 18, U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1),
982(b)(1), 1956(h) and 3551 <u>et seq.</u>; T. 21,
U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

THE UNITED STATES CHARGES:

     At all times relevant to this Information, unless otherwise stated:

I.    <u>The Defendant and Relevant Individuals and Entities</u>

     1.    Petróleo Brasileiro S.A. - Petrobras ("Petrobras") was a Brazilian state-owned and state-controlled oil company headquartered in Rio de Janeiro, Brazil, that operated to refine, produce and distribute oil, oil products, gas, biofuels and energy. The Brazilian government directly owned more than 50 percent of Petrobras's common shares with voting rights. Petrobras was controlled by Brazil and performed government functions, and thus was an "agency" and "instrumentality" of a foreign government, as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2.

     2.    Petroleos de Venezuela S.A. ("PDVSA") was the Venezuelan state-owned and state-controlled oil company. PDVSA and its subsidiaries and affiliates were responsible for exploration, production, refining, transportation and trade in energy resources in Venezuela. Among other products, PDVSA supplied asphalt to companies around the world and also

2

provided funding for various operations of the Venezuelan government. PDVSA and its

wholly-owned subsidiaries were "instrumentalities" of the Venezuelan government, as that term

is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A). PDVSA officers

and employees were "foreign officials," as that term is used in the FCPA, Title 15, United States

Code, Sections 78dd-2(h)(2) and 77dd-3(f)(2)(A).

3.    Asphalt Company, the identity of which is known to the United States,

was a company incorporated and based in the United States that was one of the largest asphalt

providers in the world. Therefore, Asphalt Company was a "domestic concern," as that term is

used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

4.    Asphalt Trading, the identity of which is known to the United States, was

a company incorporated in the Bahamas and based in the United States that was one of a group

of companies related to Asphalt Company. Asphalt Trading provided asphalt-related services to

customers, including Petrobras. Asphalt Trading's principal place of business was in the same

location as Asphalt Company's principal place of business in the United States. Therefore,

Asphalt Trading was a "domestic concern," as that term is used in the FCPA, Title 15, United

States Code, Section 78dd-2(h)(1).

5.    Asphalt Company Affiliate, the identity of which is known to the United

States, was a company incorporated in Switzerland that was one of a group of companies related

to Asphalt Company. Asphalt Company Affiliate had the same principals as Asphalt Trading

and was incorporated after lending institutions withheld lines of credit from Asphalt Trading in

or around 2012.

6.     Joint Venture, the identity of which is known to the United States, was an asphalt trading joint venture between Asphalt Company and a European asphalt company.

7.     Swiss Asphalt Company, the identity of which is known to the United States, was a company incorporated in Switzerland that was in the asphalt business and, at times, a competitor to Asphalt Company.  In or about and between 2012 and 2015, Asphalt Trading entered into various contracts with Swiss Asphalt Company to purchase and sell asphalt.

8.     The defendant DANIEL SARGEANT was a citizen of the United States who worked primarily in the United States as an executive and part owner of Asphalt Company, Asphalt Trading and Asphalt Company Affiliate from approximately 2006 through 2016.  In or about and between 2012 and 2016, SARGEANT was an executive and one of the chief decision-makers at both Asphalt Trading and Asphalt Company Affiliate.  In or about February 2016 through the present, SARGEANT was an executive at Joint Venture.  SARGEANT's responsibilities included seeking, approving and overseeing contracts with Petrobras and PDVSA for Asphalt Company, Asphalt Trading and Asphalt Company Affiliate.  Therefore, SARGEANT was a "United States person," "domestic concern," an employee of a "domestic concern" and an agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(1) and 78dd-2(i).

9.     Asphalt Trading Executive, an individual whose identity is known to the United States, was a citizen of the United States who worked in the United States as an executive and part owner of Asphalt Trading and Asphalt Company from approximately 2006 through July 2015.  In or about and between 2006 and 2012, Asphalt Trading Executive was the chief decision-maker at Asphalt Trading.  Asphalt Trading Executive's responsibilities included

4

seeking, approving and overseeing contracts for Asphalt Company and Asphalt Trading with

Petrobras and PDVSA. Therefore, Asphalt Trading Executive was a "United States person,"

"domestic concern," an employee of a "domestic concern" and an agent of a "domestic concern,"

as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(1) and

78dd-2(i).

         10.     Asphalt Trading Employee, an individual whose identity is known to the

United States, was a citizen of the United States who worked in the United States for Asphalt

Company and related companies from approximately 2006 through 2018. Asphalt Trading

Employee's responsibilities included seeking contracts for Asphalt Company, Asphalt Trading

and related companies with Petrobras and PDVSA. Therefore, Asphalt Trading Employee was a

"domestic concern," an employee of a "domestic concern" and an agent of a "domestic concern,"

as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

         11.     Asphalt Company Employee, an individual whose identity is known to the

United States, was a citizen of Venezuela and legal permanent resident of the United States as of

at least 2017. Asphalt Company Employee worked at Asphalt Company in or about and between

2012 and 2018. Asphalt Company Employee's responsibilities included seeking contracts for

Asphalt Company, Asphalt Trading and related companies with PDVSA. Therefore, Asphalt

Company Employee was an employee of a "domestic concern" and an agent of a "domestic

concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

         12.     Intermediary #1, an individual whose identity is known to the United

States, was a Brazilian national who worked in Brazil and the United States as an agent for

Asphalt Trading in or about and between the end of 2009 and early 2016. Intermediary #1's

responsibilities included seeking contracts for Asphalt Company and Asphalt Trading with Petrobras.  Therefore, Intermediary #1 was an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

13.     Petrobras Official #1, an individual whose identity is known to the United States, was a high-ranking executive at Petrobras in or about and between 2004 and 2012. Therefore, Petrobras Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

14.     Petrobras Official #2, an individual whose identity is known to the United States, was a high-ranking executive at Petrobras with responsibility over asphalt contracts in or about and between September 2010 and December 2015.  Therefore, Petrobras Official #2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

15.     Brazilian Politician #1, an individual whose identity is known to the United States, was a member of the Brazilian Congress in or about and between 2006 and 2012. Therefore, Brazilian Politician #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

16.     Brazilian Politician #2, an individual whose identity is known to the United States, was a minister in the Brazilian government in or about and between 2011 and 2015.  Therefore, Brazilian Politician #2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

17.     Intermediary #2 and Intermediary # 3, individuals whose identities are known to the United States, were bribe intermediaries and businesspeople from Rio de Janeiro,

6

Brazil, who were involved in arranging the payment of bribes to foreign officials by companies that wished to do business with Petrobras. Intermediary #2 and Intermediary #3 were hired to act as agents on behalf of Asphalt Company and Asphalt Trading in order to secure business with Petrobras by paying bribes to Petrobras and other government officials. Therefore, Intermediary #2 and Intermediary #3 were agents of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

18.     Intermediary #4, an individual whose identity is known to the United States, was a citizen of Venezuela and a naturalized United States citizen as of approximately 2014 who worked as an agent for Asphalt Company, Asphalt Trading, Asphalt Company Affiliate and Joint Venture. Therefore, Intermediary #4 was a "domestic concern" and an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

19.     PDVSA Official #1, an individual whose identity is known to the United States, was a dual citizen of Spain and Venezuela and was involved in the sale of PDVSA asphalt in or about and between 2011 and March 2015. Therefore, during that time, PDVSA Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

20.     PDVSA Official #2, an individual whose identity is known to the United States, was a citizen of Venezuela and a supervisor at PDVSA of PDVSA Official #1 in or about and between 2011 and 2015. Therefore, during that time, PDVSA Official #2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

21.     PDVSA Official #3, an individual whose identity is known to the United States, was a citizen of Venezuela and an analyst at PDVSA involved in the sale of PDVSA asphalt in or about and between 2011 and 2016.  Therefore, during that time, PDVSA Official #3 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

22.     PDVSA Official #4, an individual whose identity is known to the United States, was a citizen of Venezuela and an employee of PDVSA involved in the sale of PDVSA asphalt in or about and between 2011 and 2018.  Therefore, during that time, PDVSA Official #4 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

II.     The Foreign Corrupt Practices Act

23.     The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to corruptly offer, promise, authorize or pay money or anything of value, directly or indirectly, to a foreign government official to secure an improper advantage for the purpose of obtaining or retaining business for, or directing business to, any person.

III.    The Bribery Schemes

A.     Brazil

24.     In or about and between 2010 and 2016, the defendant DANIEL SARGEANT agreed with others, including Asphalt Trading Executive, Asphalt Trading Employee and Intermediary #1, to offer and pay bribes, through Intermediary #2, Intermediary

#3 and others, to foreign officials in Brazil on behalf of Asphalt Trading and associated companies so that they could obtain and retain business with Petrobras.

25.     In furtherance of the scheme, the defendant DANIEL SARGEANT and others, including Asphalt Trading Executive, approved bribe payments to foreign officials in order to obtain and retain business for and on behalf of Asphalt Company, Asphalt Trading and Asphalt Company Affiliate.

26.     In or about and between 2010 and November 2014, the defendant DANIEL SARGEANT and his co-conspirators, including Asphalt Trading Executive, Asphalt Trading Employee, Intermediary #1, Intermediary #2, Intermediary #3 and others, made and caused to be made bribe payments totaling more than $5 million to foreign officials in Brazil, including Petrobras Official #1, Petrobras Official #2, Brazilian Politician #1 and Brazilian Politician #2.

27.     In furtherance of the scheme, among other things, the defendant DANIEL SARGEANT and his co-conspirators established shell companies in the Marshall Islands and caused corrupt payments to be made into, from and through bank accounts located in the United States and abroad, including bank accounts in Switzerland.

28.     As a result of the bribery scheme in Brazil, Asphalt Company, Asphalt Trading, Asphalt Company Affiliate and others obtained numerous contracts with Petrobras with a total value in excess of approximately $185 million.

B.     Venezuela

29.     In or about 2012, the defendant DANIEL SARGEANT agreed with others, including Asphalt Company Employee, Asphalt Trading Employee and Intermediary #4, to offer

and pay bribes to various PDVSA officials in order to, among other things: (a) purchase asphalt from PDVSA; (b) acquire inside, non-public information from PDVSA to obtain an improper advantage in the purchase and sale of asphalt; and (c) recover certain late fees, called demurrage fees, owed by PDVSA to Swiss Asphalt Company related to the loading of asphalt.

(a)     2012-2015: Bribes to Win Contracts

30.     Following a dispute between PDVSA and Asphalt Company prior to 2012, PDVSA refused to sell asphalt to Asphalt Company or companies related to Asphalt Company. To circumvent this prohibition, Asphalt Company and Swiss Asphalt Company agreed that Swiss Asphalt Company would purchase asphalt from PDVSA at the request and direction of Asphalt Company and then resell that asphalt to Asphalt Company at a small premium.

31.     In or about and between 2012 and 2015, the defendant DANIEL SARGEANT agreed with others, including Asphalt Company Employee, Asphalt Trading Employee and Intermediary #4, to offer and pay bribes to foreign officials, including PDVSA Official #1 and PDVSA Official #2, in order for Swiss Asphalt Company to obtain contracts for the benefit of, and on behalf of, Asphalt Company, Asphalt Trading and Asphalt Company Affiliate. Swiss Asphalt Company would then, in turn, resell asphalt to Asphalt Company, Asphalt Trading and Asphalt Company Affiliate.

32.     In furtherance of the scheme, in or about and between 2012 and 2015, Asphalt Company and Asphalt Company Affiliate paid Intermediary #4 a commission, typically calculated on a per barrel basis, for asphalt that Swiss Asphalt Company purchased from PDVSA and provided to Asphalt Company. Intermediary #4 in turn paid a bribe to PDVSA Official #1, typically calculated on a per barrel basis, for the asphalt that PDVSA sold to Swiss Asphalt

Company.  PDVSA Official #1 shared a portion of those bribe payments with PDVSA Official #2.

33.     In furtherance of the scheme, in or about and between 2013 and 2015, Asphalt Company and Asphalt Company Affiliate paid Intermediary #4 approximately $1.2 million, from which Intermediary #4 in turn made bribe payments to PDVSA Official #1 and PDVSA Official #2, and kickback payments to Asphalt Company Employee.

(b)     2015 - 2018: Bribes for Inside, Non-Public Information

34.     In or about March 2015, PDVSA Official #1 stopped working at PDVSA and began working at a company that did business with PDVSA as a counter-party, buying and selling petrochemical products.

35.     In or about and between March 2015 and April 2018, the defendant DANIEL SARGEANT agreed with others, including Asphalt Company Employee, Asphalt Trading Employee, Intermediary #4 and PDVSA Official #1, to offer and pay bribes to foreign officials, including PDVSA Official #3 and PDVSA Official #4, in order to obtain non-public information from PDVSA and to obtain a competitive advantage in obtaining and retaining business with PDVSA.

36.     In furtherance of this scheme, among other things, PDVSA Official #1 and Intermediary #4 obtained non-public information from foreign officials, including PDVSA Official #3 and PDVSA #4, and provided it to Intermediary #4, who provided that information to Asphalt Company and Asphalt Company Affiliate.

37.     In order to promote and conceal the scheme, with the approval of the defendant DANIEL SARGEANT, Intermediary #4 entered into a sham consulting agreement

11

with Joint Venture, pursuant to which Intermediary #4 purportedly received a $2,000 monthly retainer.

        (c)    <u>2015 - 2018: Bribes to Recover Demurrage Fees</u>

        38.    The contracts pursuant to which PDVSA agreed to supply Swiss Asphalt Company with asphalt called for financial penalties, called demurrage fees, in the event of delays by PDVSA in delivering and loading asphalt onto Swiss Asphalt Company's ships.  Due to such delays in or about and between 2015 and 2018, PDVSA incurred more than $3 million in demurrage fees.

        39.    In or about and between March 2015 and 2018, the defendant DANIEL SARGEANT and others provided approval for Intermediary #4 to pay PDVSA Official #1 ten percent of any demurrage fees paid by PDVSA to Swiss Asphalt Company.  The purpose of this payment was so that PDVSA Official #1 would in turn pay bribes to various PDVSA employees in exchange for their authorization of the payment of demurrage fees to Swiss Asphalt Company. Swiss Asphalt Company, in its role as a pass-through, then remitted a portion of the demurrage fees to Asphalt Company.

        40.    As a result of the scheme, Asphalt Company obtained approximately $250,000 in demurrage fees.

COUNT ONE
(Conspiracy to Violate the FCPA)

        41.    The allegations contained in paragraphs one through 40 are realleged and incorporated as if fully set forth in this paragraph.

42.     In or about and between 2010 and 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant DANIEL SARGEANT, together with others, did knowingly and willfully conspire to commit one or more offenses against the United States, to wit:

(a)     being a domestic concern, an employee of a domestic concern and an agent of a domestic concern, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all and a portion of such money and thing of value would be offered, given, and promised to a foreign official and to a foreign political party and official thereof, for purposes of:  (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her and its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her and its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Asphalt Company and others in obtaining and retaining business for and with, and directing business to, Asphalt Company and others, contrary to Title 15, United States Code, Section 78dd-2; and

(b)     while in the territory of the United States, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an

13

offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be offered, given, and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her and its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her and its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Asphalt Company Affiliate and others in obtaining and retaining business for and with, and directing business to, Asphalt Company and others, contrary to Title 15, United States Code, Section 78dd-3.

43.     In furtherance of the conspiracy and to effect its objects, the defendant DANIEL SARGEANT, together with others, committed and caused to be committed, among others, the following:

OVERT ACTS

(a)     On or about July 5, 2010, Asphalt Trading Employee sent an e-mail to SARGEANT and Asphalt Trading Executive reporting that "one of the 'expediters' in Brazil 'working' the Petrobras contract" was in Florida and would come to the office for Asphalt Company and Asphalt Trading the next day.

14

(b)     On or about August 9, 2010, SARGEANT sent an e-mail to Asphalt Trading Executive informing him of the "good news" that Asphalt Trading's ships had completed two shipments of asphalt to Petrobras.

(c)     On or about August 9, 2010, Asphalt Trading Executive sent an e-mail in response to the e-mail sent by SARGEANT referenced in Paragraph 43(b), acknowledging, "Wow guess last Brazil trip with crooks paid off.  Should go again before contract next year gets hot and heavy."

(d)     On or about September 10, 2010, Intermediary #1, Petrobras Official #2 and Intermediary #3 traveled from Brazil to the United States to meet with executives and employees of Asphalt Company and Asphalt Trading, including Asphalt Trading Employee and Asphalt Trading Executive.

(e)     On or about September 15, 2010, an executive at Asphalt Trading sent an email to SARGEANT confirming the company's transfer of $929,217.66 to the bank account of a company controlled by Intermediary #2 and reporting the following to SARGEANT: "Regarding Brazil. Paid in full."

(f)     On or about October 4, 2011, Asphalt Trading Company wired $126,552.24 from a bank account in Florida that it controlled, through the Eastern District of New York, to a bank account in Switzerland of a company controlled by Intermediary #2.

(g)     On or about September 19, 2013, Asphalt Company Employee sent an e-mail to Intermediary #4 asking him for internal, non-public PDVSA information from PDVSA Official #1, and using the code name "Oiltrader" to refer to PDVSA Official #1.

15

(h)     On or about September 25, 2013, Intermediary #1 sent an e-mail to Asphalt Trading Employee attaching an invoice from "[o]ur friends."

(i)     On or about September 25, 2013, Asphalt Trading Employee forwarded to management at Asphalt Company Affiliate the e-mail from Intermediary #1 and the invoice from "[o]ur friends" referenced in Paragraph 43(h) with a request to "Please pay."

(j)     On or about August 18, 2014, Asphalt Company Employee forwarded an e-mail to Asphalt Trading Employee that Asphalt Company Employee had received from Intermediary #4 and that Intermediary #4 had previously received from PDVSA Official #1.  This e-mail contained an internal PDVSA e-mail regarding PDVSA's assessment of the demurrage fees it owed in connection with various asphalt shipments.

(k)     On or about February 11, 2016, Asphalt Company Employee sent an e-mail to the director of Asphalt Company Affiliate, copying Asphalt Trading Employee and SARGEANT, attaching a Past Due Statement from Intermediary #4 and stating:

> Per information from [the executive at Asphalt Company] he has approved and giving [sic] you payment instructions for the attached invoice.  Since we are very sensitive on time due to new activities are ready to start.  Please advise me as soon as wire transfer goes out as I need to manage the situation.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT TWO
(Conspiracy to Commit Money Laundering)

44.     The allegations contained in paragraphs one through 40 and 43 are realleged and incorporated as if fully set forth in this paragraph.

45.     In or about and between 2010 and 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant DANIEL SARGEANT, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of one or more specified unlawful activities, to wit: (i) felony violations of the FCPA, in violation of Title 15, United States Code, Sections 78dd-2 and 78dd-3; and (ii) offenses against a foreign nation involving the bribery of a public official, and the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of Article 333 of the Brazilian Penal Code, contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION AS TO COUNT ONE

46.     The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code Section 2461(c), which require any person convicted of such offense to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense.

47.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been comingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT TWO

48.     The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

49.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

18

   (e) has been comingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation

   (Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))


RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York


ROBERT A. ZINK
Chief, Fraud Section
Criminal Division, Dept. of Justice